## Addison Case.

Argued January 11, 1956. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*James L. Stern,* Deputy City Solicitor, with him *David E. Pinsky, Herbert M. Linsenberg* and *William D. Valente,* Assistant City Solicitors and *Abraham L. Freedman,* City Solicitor, for appellant.

*Samuel Gorson,* for appellee.

*Irving R. Shull,* with him *Alfred I. Ginsburg* and *Bernard L. Lemisch,* for amicus curiae.

OPINION BY MR. JUSTICE JONES, April 16, 1956:

The principal question in this case is whether a general statute, which authorizes an appeal by an aggrieved employee from a decision of a civil service board of any city to the court of common pleas of the county, worked a nullification of the provision in Philadelphia's Home Rule Charter which restricts the scope of judicial review to be accorded by the court of common pleas upon an appeal thereto from a decision of the Civil Service Commission of Philadelphia.

On the present appellee's appeal to the court below from a decision of the Philadelphia Civil Service Commission, the court held that the general statute was paramount and, therewith, proceeded to a disposition of the appeal on the merits in disregard of the limitation upon court review imposed by the Philadelphia

Home Rule Charter. A secondary question then followed as to whether the evidence adduced at the hearing before the Civil Service Commission was sufficient to warrant the employee's dismissal. The court deemed the evidence insufficient to justify the dismissal and entered an order sustaining the appeal. From that order, the City took this appeal.

The employee, George E. Addison, a patrolman of the City of Philadelphia, was dismissed by the Commissioner of Police for conduct unbecoming an officer in that he had accepted a mortgage loan of $2500 from one Leo "Clee" Coleman, a well-known "numbers banker". At the hearing before the Civil Service Commission on Addison's appeal of his dismissal, it was established beyond question that the $2500 loan was the full purchase price of a residence property bought by Addison at sheriff's sale; that the money so loaned was wholly supplied by Coleman; and that the mortgage which Addison and his wife executed to secure the loan named Leo Coleman as mortgagee and was for a ten-year term with interest at four per cent. At the time of this occurrence and for upwards of four years prior thereto, Addison's area of police duty embraced 1632 North 13th Street which was the location of "Clee" Coleman's "headquarters". Addison denied that he knew Leo Coleman personally at the time of the mortgage transaction but admitted that he had known of "Clee" Coleman, "the numbers banker", for many years. He claimed not to have thought of Leo Coleman, the mortgagee and lender of the purchase money, as being "Clee" Coleman. Addison further testified that the loan had been arranged for by one Abe Johnson, a real estate agent of the neighborhood, whose services Addison had enlisted before he bid in the property at sheriff's sale. Johnson was not only well acquainted with Addison but also with "Clee" Coleman with whom he

had had considerable business dealings. When Addison and his wife signed the mortgage, he read and noted that Leo Coleman was the mortgagee. He said that it was more than eighteen months after the mortgage had been placed that he first knew that the loan had come from "Clee" Coleman—a discovery which he did not communicate to anyone. About that time the mortgage was assigned to another lender. On the testimony so adduced at the hearing, the Civil Service Commission found Addison guilty of gross stupidity, if not culpable impropriety, in accepting a full purchase price mortgage loan on generous terms from one engaged in a "business" such as Coleman's, operating within Addison's bailiwick. The Commission accordingly concluded that Addison's dismissal by the Police Commissioner was for just cause.

Pursuant to the authority conferred by the Amendment of Article XV, Section 1, of our State Constitution, adopted November 7, 1922, the legislature, by Act of April 21, 1949, P. L. 665, 53 PS §3421 et seq., authorized cities of the first class to frame and adopt their own charters and to exercise powers and authority of local self-government subject to the restrictions, limitations and regulations prescribed by the Act. The presently material portions of the enabling Act which specify the power and authority conferred and the limitations and restrictions imposed are as follows:

"Section 17. General Grant of Power and Authority.—Subject to the limitations hereinafter prescribed, the city taking advantage of this act . . . shall have and may exercise all powers and authority of local self-government and shall have complete powers of legislation and administration in relation to its municipal functions . . . . The charter of any city adopted or amended in accordance with this act may provide for a form or system of municipal government and for the

exercise of any and all powers relating to its municipal functions . . . to the full extent that the General Assembly may legislate in reference thereto as to cities of the first class, and with like effect . . . .

"Section 18. Limitations.—. . . Notwithstanding the grant of powers contained in this act, no city shall exercise powers contrary to, or in limitation or enlargement of, powers granted by acts of the General Assembly which are . . . (b) Applicable in every part of the Commonwealth. (c) Applicable to all the cities of the Commonwealth."

The Charter Commission, which was created in accordance with the provisions of the enabling Act of 1949, cit. supra, framed a proposed Home Rule Charter for Philadelphia which was adopted by the electors of the City at a special election held on April 17, 1951. By its terms, the Charter was to become operative (except for a few items not presently material) on the first Monday of January, 1952.

Section 7-201 of the Charter, as so adopted, after conferring a right upon an aggrieved civil service employee of the City to appeal to the Civil Service Commission, ordained that "Findings and decisions of the Commission and any action taken in conformance therewith as a result thereof shall be final and there shall be no further appeal on the merits, but there may be an appeal to the courts on jurisdictional or procedural grounds."

By Act of September 29, 1951, P. L. 1654, 53 PS §304, entitled "An Act Providing for appeals from the decisions of civil service boards and commissions in cities", the legislature provided generally that "All decisions of the civil service board or commission in any city shall be subject to appeal to the court of common pleas or the county court of the county in which the city is located. The appeal may be taken, by any em-

ployeé aggrieved thereby, at any time within thirty days after the decision has been entered of record."

Briefly stated, the specific question here involved is whether the scope of review by a common pleas court on an appeal from an order of the Civil Service Commission of Philadelphia is governed by Section 7-201 of the City's Home Rule Charter or by the Act of September 29, 1951, P. L. 1654. While this question was raised in *Civil Service Commission v. Wilson,* 373 Pa. 583, 586-587, 96 A. 2d 863, it was not there passed upon, Chief Justice STERN, who spoke for the court, expressly noting that ". . . it is obviously unnecessary to determine that question since, in any event, the dismissal of Wilson's appeal by the court below must be affirmed even if the Act of Assembly were to be held controlling. . . ." And so, up to this time, the question has remained an open one in this court. The question of the legislature's power to modify the Philadelphia Home Rule Charter, which the appellee has interjected, is not here involved and will not, therefore, be considered.

The court below based its decision in this case on the reasoning of its opinion in *Philadelphia Civil Service Commission v. Connolly,* 1 D. & C. 2d 399, where it had held that the Act of 1951, supra, impliedly suspended the above-quoted provision of Section 7-201 of the Charter. The principal reasons assigned for the conclusions arrived at in the *Connolly* case, and the only ones raised on this appeal, are (1) that Philadelphia's Home Rule Charter was incapable of restricting the jurisdiction and power of the court of common pleas in respect of appeals thereto since the court is not a municipal instrumentality and (2) that the Act of September 29, 1951, P. L. 1654, has State-wide applicability and, therefore, by virtue of the restriction contained in Section 18 of the enabling Act of 1949, supra, superseded Section 7-201 of the Charter.

Treating with these grounds in their reverse order, the Act of September 29, 1951, P. L. 1654, is not the type of general statute which Section 18 of the enabling Act of 1949, supra, intended should take precedence over any of the provisions of a Home Rule Charter formulated in accordance with the enabling Act.

In *Lennox v. Clark*, 372 Pa. 355, 378-379, 93 A. 2d 834, Mr. Chief Justice STERN, speaking for the court, said, "There seems to exist an erroneous impression on the part of the plaintiffs in all these actions regarding section 18 of the Home Rule Act which forbids the city [Philadelphia] to exercise powers contrary to powers granted by acts of the General Assembly applicable in every part of the Commonwealth or to all the cities of the Commonwealth. It is argued that because plaintiffs perform their respective functions and duties in pursuance of general laws which impose similar or identical duties upon officers holding corresponding positions throughout the Commonwealth, the city is thereby shorn of all power to interfere with them or their employes. Nothing could be further from the truth, it being abundantly clear that the limitations of power referred to in section 18 concern only laws in relation to substantive matters of State-wide concern, such as the health, safety, security and general welfare of all the inhabitants of the State, and not to matters affecting merely the *personnel* and *administration* of the offices local to Philadelphia and which are of no concern to citizens elsewhere. Any other conclusion would reduce the Charter to a mere scrap of paper and make the much heralded grant of Philadelphia home rule an illusion and a nullity."

The holding in the *Lennox* case, supra, is in accord with the uniform rulings on related questions by the courts of last resort of other States where municipal Home Rule obtains. Thus, in *City of Portland v. Welch,*

154 Ore. 286, 299, 59 P. 2d 228, 233, the Supreme Court of Oregon said,—"The great majority of the home rule states have accepted the rule that general laws pertaining to purely municipal affairs as distinguished from state affairs—those in which the interests of the state dominate—do not supersede the charters or ordinances of municipalities in conflict therewith [citing cases]." Again, in *Goodwin v. Oklahoma City,* 199 Okla. 26, 182 P. 2d 762, 764, the Supreme Court of Oklahoma held that the provisions in a Home Rule Charter relating to the removal and discharge of appointed officers or employees are solely matters of municipal concern and are paramount to the general laws of the State on the subject. Other courts have likewise held that a provision in a Home Rule Charter governing the dismissal of municipal employees relates to a local matter and supersedes any conflicting general statutory provision notwithstanding that the statute is of general applicability. See, e.g., *City of Wewoka v. Rodman,* 172 Okla. 630, 631, 46 P. 2d 334, 335; and *State ex rel. Fischer v. City of Lincoln,* 137 Neb. 97, 102, 288 N.W. 499, 502.

What was held in the *Lennox* case, supra, is equally pertinent here. The administration of Philadelphia's civil service with reference to the removal or discharge of City employees is obviously not a matter of substantial State-wide interest but is one of purely local concern. It is beyond reasonable dispute that the subject does not affect the general welfare of the inhabitants of the State outside of Philadelphia. Consequently, the Charter provision prevails in the premises and not the general statute.

That brings us to the other of the two main grounds relied upon by the court below, namely, that the limitation upon the scope of court review of a decision by the Philadelphia Civil Service Commission is unconstitu-

tional. The error in that conclusion is transparent. It stems from the fact that the court mistakenly conceived of the Home Rule Charter as being something less, in force and effect, than a statute. Thus, the court opined that whatever else the Home Rule Charter is it is not a law enacted by the legislature. Of course, it was not enacted by the legislature. But, it emanated from the relevant provision of the State Constitution, implemented for appropriate execution by the enabling Act of 1949, and was duly adopted (i.e., enacted) by the affirmative vote of the electors of the City as the organic law of the corporate municipal body. That the Charter constituted legislation no less than does a statute of the legislature to like end is too plain for even cavil. Whether a municipal charter comes into being by direct statutory grant of the legislature or by adoption by the constituent electorate in the exercise of power constitutionally reposed, it is as much legislative in the one instance as in the other and has equal legal force and standing in both. Indeed, a constitutionally permissible adoption of a municipal charter by the electorate is not one whit less in dignity than a statute of the legislature granting a charter. Where it is adopted by a constitutionally empowered electorate, it affords an example of pure democracy—the sovereign people legislating directly and not by representatives in respect of the organization and administration of their local government. Specifically, therefore, Philadelphia's Home Rule Charter constitutes legislation (i.e., the adoption or enactment of a law by a competent body) just as much as did the City's Charter of 1919 which the legislature itself enacted. Wherefore, upon its due adoption, Philadelphia's Home Rule Charter took on the force and status of a legislative enactment. There is no special virtue in the word "legislative" merely because it stems from the same root

as "legislature". It derives its qualifying meaning from the character of the thing done.

It follows that the limitation on court review of decisions of Philadelphia's Civil Service Commission, as provided for in Section 7-201 of the Charter, was competently and effectively enacted and was not an exertion of the City's power to legislate concerning municipal affairs, as the learned court below erroneously assumed. In fact, the opinion for the lower court expressly conceded, as indeed it had to, that the legislature could have limited the scope of appellate review to the extent provided by Section 7-201 of the Charter and consonantly cited *Kaufman Construction Co. v. Holcomb,* 357 Pa. 514, 55 A. 2d 534. In that case our present Chief Justice, speaking with respect to the difference in court review where a statute or arbitration agreement makes no mention of any right of appeal and where it is provided that the order or decision of the adjudicating agency shall be final and no appeal allowed, aptly said,—"The distinction thus made has been reiterated and reinforced in a multitude of subsequent cases holding that where a statute expressly provides that there shall be no appeal the scope of appellate review is limited to the question of jurisdiction and the regularity of the proceedings; the merits of the controversy cannot be considered even though the interpretation given to the facts or the law by the governmental agency or the court below may have been erroneous." See the many cases cited in footnote 2 at p. 518 of the *Holcomb* case, supra.

The rule as to limited court review of dismissals of employees subject to civil service is the same under federal law. In *Levine v. Farley,* 107 F. 2d 186, 191, cert. den. 308 U.S. 622, it was said with respect to the dismissal of a Federal civil service employee,—"A court of law has no jurisdiction to inquire into the guilt or

innocence of the employee as to the charges upon which he was removed." See, also, *Levy v. Woods,* 171 F. 2d 145, 146 (C.A.D.C.) ; and *Asher v. Forrestal,* 71 F. Supp. 470, 471. Likewise, dismissals of employees of the Commonwealth, subject to civil service, are accorded but a limited court review except for a dismissal made for ulterior reasons. In other words, the decisions of the State Civil Service Commission are ordinarily final and not reviewable on the merits by any court: Act of August 5, 1941, P. L. 752, Section 807, 71 PS §741.807.

The phrase "jurisdictional or procedural grounds" to which an appeal to the courts from a decision of the Civil Service Commission is restricted by Section 7-201 of the Charter needs no elucidation here. Its meaning and scope are well known in the law. See *Kaufman Construction Co. v. Holcomb,* supra, and cases there cited. Nor is any want of due process involved in such a limitation.

In the instant case neither a jurisdictional nor procedural question was raised or considered in the court below. And, no charge was made that the Charter and relevant regulations were not fully complied with or that the appellee did not have a full and fair hearing. On the contrary, the record discloses that he had due notice of the hearing before the Civil Service Commission, appeared there, was represented by counsel and testified in his own behalf. Such being the procedural situation, the learned court below plainly erred in not dismissing the appeal and in assuming to enter upon a disposition of the charge against the appellee on the merits.

The order of the court below is reversed and the decision of the Civil Service Commission reinstated at the cost of the City.

Mr. Justice ALLEN M. STEARNE took no part in the decision of this case.

DISSENTING OPINION BY MR. JUSTICE BELL:

The First Class City Home Rule Act of April 21, 1949, P. L. 665, authorizes cities to frame and adopt or amend their own charters and exercise all powers and authority of local self-government "subject to the limitations hereinafter prescribed". The limitations hereinafter prescribed are, inter alia:

"Section 18. . . . Notwithstanding the grant of powers contained in this act, no city shall exercise powers *contrary to*,* or in limitation or enlargement of, *powers granted by acts* of the General Assembly which are—(a) Applicable to a class or classes of cities on the following subjects: (9) . . . (b) Applicable in every part of the Commonwealth. (c) Applicable to all the cities of the Commonwealth."

It is crystal clear that that Act is directly applicable to and controls the instant case, and invalidates that part of the Charter which is in conflict with the Act of September 29, 1951, P. L. 1654, 53 PS §304.

The Act of September 29, 1951, supra, provides "all decisions of the Civil Service Board or Commission *in any city* shall be subject to appeal to the Court of Common Pleas. . . . The appeal may be taken by any employe aggrieved thereby, . . . ." Could any language be clearer? That Act, by the clear language contained in its title and in its provisions, applies not to some cities, or to all cities except cities of the first class, or except to chartered cities—it applies to all cities.

That Act of the Legislature is by its clear terms and intent of State-wide application to *all* cities. It

* Italics throughout, ours.

grants unquestionably to discharged civil service employes *a right of appeal* to the Courts. This right of appeal is not a mere matter of procedure or local concern—it is a matter of substance, a matter of State-wide concern, which the Legislature wisely said in the Act of 1951 applies to *all* cities. A right of appeal *to a Court* given to a policeman or other Civil Service employe who is discharged from his job for "just cause", by a civil service commission, is such a fundamental, substantive, American right that it is of State-wide concern, not only to the Legislature but to all of the people of Pennsylvania! As such, it is paramount to and invalidates any City Ordinance or City Charter which, as here, conflicts therewith.*

The decision of the majority flies directly in the teeth of the clear language of the Act of 1949! The majority relies upon *Lennox v. Clark,* 372 Pa. 355, 93 A. 2d 834. That case was factually entirely different from the instant case, and as such is clearly distinguishable. If, however, we assume that the language of that opinion is applicable to the instant case, i.e., that subparagraphs (b) and (c) of the Act of 1949 limited the City of Philadelphia to *substantive* matters of State-wide concern, it does not support the majority opinion but strengthens and confirms this opinion. Moreover, the majority opinion is contrary to and in conflict with *Kelly v. Philadelphia,* 382 Pa. 459, 115 A. 2d 238. The Federal and out of state decisions cited in the majority opinion are not only not binding but also they are clearly distinguishable—in those cases there was no statutory or constitutional limitation of the rights of a city to local self-government such as exists in Pennsylvania.

---

* It is unnecessary to decide whether this provision of the Charter violates the Constitution.

The lower Court in discussing the merits, speaking through Judge DAVIS, said:

"Addison was discharged for purchasing his home entirely with monies furnished him by Leo 'Clee' Coleman, the well known numbers banker.

"We have sustained his appeal for failure of proof of the essential element of the specification, viz., that Addison knowingly borrowed money from Leo Coleman, the notorious numbers banker.

"We have difficulty concluding from the record without gross speculation, that Addison received mortgage money from a person personally known to him at all, much less known to him to be a notorious numbers banker.

"The following factors militate against appellant's knowledge thereof. He pursued normal legitimate channels to purchase and pay for his home. He inquired of the real estate broker, Abe Johnson, whom he had known for years as a neighborhood realtor, as to the value and the amount of mortgage money he might anticipate obtaining. He engaged an attorney who bid, prepared the deed and mortgage, procured the actual funds, and handled the matter for him. Thereafter he paid monthly installments thereon to the agents of the mortgagee and subsequent assignees.

"To purchase the property was his unquestionable right. To mortgage the property likewise was his right. To mortgage the property to a person named Leo Coleman was his right. Only to knowingly do so to Leo 'Clee' Coleman, the numbers banker, was not his right.

"There is no evidence in the record from which any responsible fact finding tribunal can conclude that Addison knew at the time that he executed the mortgage who the actual lender of the money was, much less that he knew him to be Clee Coleman, the numbers

banker.  See Gartland v. City of Philadelphia, 70 D. & C. 161.

"Suspicion was aroused by the fact that the amount of the mortgage equalled the bid to the sheriff.  It would have been easy and better to have offered testimony from a qualified realtor that such a mortgage was inordinately large for the premises in question and not indicated as being warranted by its market value if that was the case.

"Further suspicion was indulged in from the fact that Addison made only one numbers arrest in the several years while on duty in the area where Clee Coleman lived.  How many arrests should he have made?  How many arrests did others make?  Both facts were susceptible of proof, if relevant, and not proven.

"We had occasion to review the kind of substantial proof necessary in Connolly case, supra.  Suspicion is not enough.

"We have reviewed the record carefully and conclude that the Civil Service Commission acted on suspicion and not on substantive proof, for which reason we have sustained the appeal."

The evidence was sufficient to support the findings of the Court below; there was no error of law; and I cannot say that the trial Judge, who saw and heard the witnesses, and whose findings and conclusions were supported by the Court en banc, committed a manifest abuse of discretion.  For these reasons, I would affirm the judgment of the Court below.

Mr. Justice MUSMANNO joins in this dissenting opinion.